NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0743-10T4

BOROUGH OF SEASIDE PARK,
SEASIDE PARK BOARD OF
EDUCATION, SUSAN BROSNAN,
THOMAS CONNORS, PATRICIA
DEGUTIS, FAYE HARING, JAMES
JABLONSKI, LOUIS MACCHIAVERNA,
ROBERT MATTHIES, DAVID MEYER,
RICHARD MCMILLAN, MARYANN
PALMISANO, ANDREW SBORDONE,
ANN WEHRLEN, and MARTY WILK,
JR.,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

COMMISSIONER OF THE NEW
JERSEY DEPARTMENT OF
EDUCATION, CENTRAL
REGIONAL SCHOOL DISTRICT
BOARD OF EDUCATION, BERKELEY
TOWNSHIP, BERKELEY TOWNSHIP
BOARD OF EDUCATION, BOROUGH
OF OCEAN GATE, OCEAN GATE
BOARD OF EDUCATION, and
BOROUGH OF SEASIDE HEIGHTS,

     Defendants-Respondents,

and

BOROUGH OF ISLAND HEIGHTS,
ISLAND HEIGHTS BOARD OF

| APPROVED FOR PUBLICATION |
| August 12, 2013 |
| APPELLATE DIVISION |

EDUCATION, and SEASIDE
HEIGHTS BOARD OF EDUCATION,[1]

    Defendants-Respondents/
    Cross-Appellants.

_____

        Argued: December 19, 2012 - Decided: August 12, 2013

        Before Judges Axelrad, Sapp-Peterson and Nugent.

        On appeal from the Superior Court of New Jersey, Chancery Division, Ocean County, Docket No. C-162-07.

        Vito A. Gagliardi, Jr., argued the cause for appellants/cross-respondents (Porzio, Bromberg & Newman, P.C., attorneys; Mr. Gagliardi, of counsel and on the briefs; Kerri A. Wright and Phillip C. Bauknight, on the briefs).

        Melissa T. Dutton, Deputy Attorney General, argued the cause for respondent Commissioner of the New Jersey Department of Education (Jeffrey S. Chiesa, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Dutton and Susan M. Huntley, Deputy Attorney General, on the brief).

        Arthur Stein argued the cause for respondent Central Regional School District Board of Education (Stein & Supsie, attorneys; Mr. Stein, of counsel and on the brief; Angela M. Koutsouris, on the brief).

_____

[1] The Seaside Heights Board of Education also filed a third-party complaint against all the parties that mirrored the claims of plaintiffs' second amended complaint. For ease of reference, the appeal is analyzed based on plaintiffs' second amended complaint as equally applicable to the third-party complaint.

               A-0743-10T4

Francis J. Campbell argued the cause for respondent Township of Berkeley (Campbell & Pruchnik, LLC, attorneys; Mr. Campbell, of counsel and on the brief).

Dina M. Vicari argued the cause for respondent Berkeley Township Board of Education (R.C. Shea & Associates, attorneys; Ms. Vicari, on the brief).

Robert W. Allen argued the cause for respondents Borough of Ocean Gate and Ocean Gate Board of Education (Gluck & Allen, LLC, attorneys; Gena M. Koutsouris, on the brief).

Kenneth M. Kukfa argued the cause for respondent/cross-appellant Borough of Island Heights (Kenneth M. Kukfa, attorney; Christian E. Schlegel, on the brief).

Ben A. Montenegro argued the cause for respondent/cross-appellant Island Heights Board of Education (Montenegro, Thompson, Montenegro & Genz, P.C., attorneys; Mr. Montenegro, of counsel and on the brief).

David M. Casadonte argued the cause for respondent/cross-appellant Seaside Heights Board of Education.

Respondent Borough of Seaside Heights has not filed a brief.

The opinion of the court was delivered by

AXELRAD, P.J.A.D.

Plaintiffs-appellants, the Borough of Seaside Park, its Board of Education, and thirteen taxpaying residents, as well as defendants-respondents/cross-appellants, the Seaside Heights Board of Education, and the Borough of Island Heights and its

Board of Education, appeal from the Law Division's dismissal of their various claims seeking dissolution of the Central Regional School District (Central Regional or District), permission to withdraw from the District, or alteration of the District's funding formula.[2] We are satisfied the Legislature has established a comprehensive scheme for plaintiffs to seek this relief, which includes a voter referendum. The referendum held on dissolution failed, and plaintiffs did not pursue the statutory processes for withdrawal and modification of the tax allocation method for Central Regional. Plaintiffs have not asserted a cognizable constitutional or other claim that would provide any legal or equitable basis for judicial intervention and relief. Moreover, even if we held that plaintiffs exhausted their administrative remedies and are subject to a substantially inequitable tax allocation, they would not be entitled to the extraordinary equitable relief afforded in Petition for Authorization to Conduct a Referendum on Withdrawal of North Haledon School District from the Passaic County Manchester Regional High School District, 181 N.J. 161 (2004) (North Haledon). Accordingly, we affirm.

---

[2] Cross-appellants only sought dissolution of Central Regional, and the Seaside Heights Board of Education additionally sought to withdraw along with Seaside Park.

We place this appeal in context by first reciting the history of regional school districts, including the history of their funding, and the statutory mechanisms for dissolving or withdrawing from a regional school district. We will then discuss the specifics of Central Regional and the subject litigation.

I.

In 1931 the Legislature authorized the establishment of regionalized school districts. L. 1931, c. 275, § 1. Costs were to be apportioned among constituent districts "upon the basis of ratables." L. 1931, c. 275, § 8. The "average daily enrollment" method of apportionment was introduced in 1953, i.e., per pupil basis, as an alternative to the existing ratable method and was made available to all regional school districts in 1955 subject to approval by the electorate. See Berkeley Heights Twp. v. Bd. of Educ., 23 N.J. 276, 283 (1957).

In a series of decisions in the 1970s, the Supreme Court held the existing system of public school funding in New Jersey unconstitutional based upon discrepancies in dollar input per pupil, denying a thorough and efficient education, and required the Legislature to adjust the funding methods. See Robinson v. Cahill, 69 N.J. 133, cert. denied sub nom Klein v. Robinson, 423 U.S. 913, 96 S. Ct. 217, 46 L. Ed. 2d 141 (1975); Robinson v.

Cahill, 67 N.J. 35 (1975); Robinson v. Cahill, 63 N.J. 196, cert. denied sub nom. Dickey v. Robinson, 414 U.S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (1973); Robinson v. Cahill, 62 N.J. 473 (1973).

In response, the Legislature passed an amendment to N.J.S.A. 18A:13-23 in 1975 that altered the means by which regional school districts were to be funded from a per pupil basis to an equalized value of real estate situated in each district, which shifted costs to municipalities with higher property values.[3]  N. Haledon, supra, 181 N.J. at 165.  The Legislature also adopted procedures for initiating withdrawal from a limited purpose regional school district,[4] including an application to the county superintendent to investigate the advisability of withdrawal or dissolution, N.J.S.A. 18A:13-51; a report from the county superintendent, N.J.S.A. 18A:13-52 and -

_____

[3] In 1990, the Supreme Court ruled that the 1975 Act was unconstitutional as applied as it did not provide a thorough and efficient system of education to pupils residing in poorer urban districts, and ordered the Act to be amended or new legislation passed in order to ensure proper funding for those districts. Abbott v. Burke, 119 N.J. 287, 295, 384-85 (1990) (Abbott II). The Abbott litigation continues to this day.  See Abbott v. Burke, 206 N.J. 332 (2011).

[4] Limited purpose regional school districts operate one or more of the following:  "elementary schools, junior high schools, high schools, vocational schools, special schools, health facilities or particular educational services or facilities." N.J.S.A. 18A:13-2(b).

53; a petition to the Commissioner of Education (Commissioner) for permission to conduct a referendum, N.J.S.A. 18A:13-54 and -55; a report from the Board of Review (Board) granting or denying the petition, N.J.S.A. 18A:13-56; and a referendum, N.J.S.A. 18A:13-57 to -59. L. 1975, c. 360.

In 1993, the Legislature again amended N.J.S.A. 18A:13-23 to allow regional districts to choose among equalized valuation, per pupil enrollment, or a combination of the two through voter approval at an annual or special election. L. 1993, c. 67, § 1; N. Haledon, supra, 181 N.J. at 166. The goal of this legislation was to "encourage[] the formation of regional school districts by allowing school districts considering regionalization greater freedom in determining how costs should be apportioned among the constituent districts." Statement to Assembly Substitute for A. 1822 and 1063 (Feb. 8, 1993). In this regard, the Legislature acknowledged that the requirement of cost apportionment based on equalized valuation acted as "a disincentive to regionalization for certain districts which have high property values and a small pupil population, when considering joining with a municipality that has low property values and a large pupil population." See, e.g., Assembly Education Committee Statement to A. 1822 (Oct. 1, 1992); Senate

Education Committee Statement to Assembly Substitute for A. 1822 and 1063 (Dec. 10, 1992).

Also in 1993, the Legislature revised the law which provided a procedure for withdrawal from a regional school district by adding a parallel procedure for the dissolution of a district. L. 1993, c. 255. This amendment set forth the following standard for determining if a referendum on withdrawal or dissolution was successful:

> For withdrawal from a regional district, the question shall be deemed adopted if it receives an affirmative vote of a majority of the votes cast within the withdrawing constituent district and it receives an affirmative vote of a majority of the overall votes cast in the entire regional district. For dissolution of a regional district, the question shall be deemed adopted if it receives an affirmative vote in a majority of the individual constituent districts and it receives an affirmative vote of a majority of the overall votes cast in the entire regional district.
>
> [L. 1993, c. 255, § 8; N.J.S.A. 18A:13-59.]

The Legislature also authorized the State Board of Education to promulgate regulations to effectuate the provisions of the Act. L. 1993, c. 255, § 14.

In 2004, the Supreme Court decided North Haledon. There, North Haledon, Haledon, and Prospect Park had formed a limited purpose regional school district in the 1950s, providing secondary education at Manchester Regional High School using a

per pupil method for apportioning costs; however, in 1975 the funding method was changed to an equalized valuation. Supra, 181 N.J. at 165. Consequently, because North Haledon had the highest tax base of the three municipalities, its share of the operating costs significantly increased disproportionally to the other two districts. Id. at 165-66.

After the 1993 amendment, North Haledon pursued a referendum that would return the district to per pupil cost apportionment, which failed because it did not garner a majority of voters in Haledon and Prospect Park. Id. at 166. By 1994, North Haledon was paying over half of the district's operating costs and more than two to three times per pupil than that paid by Haledon and Prospect Park, respectively. Ibid. In 2001, North Haledon was paying $18,400 per pupil, while Haledon was paying $5300, and Prospect Park was paying $3400. Id. at 169.

In 1998, North Haledon initiated the process of withdrawal. Although the county superintendent's investigative report did not favor withdrawal, North Haledon petitioned the Commissioner for permission to hold a referendum pursuant to N.J.S.A. 18A:13-54. Id. at 166-67. The Board granted the petition, notwithstanding that North Haledon's withdrawal would result in a nine percent reduction in white students in Manchester Regional's student body. Id. at 167-72. The Board found the

racial impact negligible because, based upon demographic changes in the three sending districts, whether North Haledon stayed or withdrew, the minority population at the high school would continue to rise and the white population would continue to decline. Id. at 172.

The Regional Board, Haledon, and Prospect Park appealed the Board's order, but no stay was entered to block the referendum pending appeal. Ibid. The voters approved the referendum at a special election, and the Commissioner set a date for North Haledon's withdrawal from the district. Ibid.

We reversed the Board, 363 N.J. Super. 130, 144 (App. Div. 2003), disagreeing that the anticipated nine percent decrease in the white student population of Manchester Regional was a negligible impact. The Supreme Court affirmed, holding that

> the constitutional imperative to prevent segregation in our public schools applies as well to the Board within the ambit of the exercise of its responsibilities under N.J.S.A. 18A:13-56(b)(4), which requires the Board to deny a withdrawal petition for "[a]ny other reason, which it may deem to be sufficient."

> [N. Haledon, supra, 181 N.J. at 181.]

The Court concluded that

> withdrawal by North Haledon will deny the benefits of the educational opportunity offered by a diverse student body to both the students remaining at Manchester Regional and to the students from North

Haledon. We conclude that the Board's decision permitting a referendum on the question of withdrawal is not sustainable as a matter of law, and affirm the decision of the Appellate Division reversing that decision.

[Id. at 184.]

However, the Court acknowledged North Haledon's justifiable concern about the disproportional tax burden shouldered by its citizens as compared to the other constituent municipalities, id. at 184-85, so it modified the judgment and remanded to the Commissioner "to develop, in consultation with the constituent municipalities, an equitable cost apportionment scheme for the Regional District." Id. at 186. In so ruling, the Court held:

the constitutional imperative to address racial segregation requires the Board to compel North Haledon to remain in the Regional District despite the tax burden on its citizens. . . . [W]hen a constituent municipality is compelled to participate in a Regional District, N.J.S.A. 18A:13-23 is not applicable and the Commissioner may determine cost allocations among and between Haledon, Prospect Park, and North Haledon.

[Ibid.]

On remand, by letter dated September 21, 2004, the Attorney General's office advised the Commissioner:

You have requested advice concerning whether the authority granted to you by the Supreme Court in [North Haledon] to equitably revise the cost apportionments among the constituent districts in the Manchester Regional High School District may be

11

utilized in other situations. You are advised that such power may be exercised by the Commissioner where the relative tax burden of the constituent districts in a regional district is inequitable and the Board of Review (or a reviewing court) denies dissolution or withdrawal of constituent districts from the regional school district because dissolution/ withdrawal would result in deficiencies of a constitutional dimension.

. . . .

In sum, the Commissioner is authorized to act notwithstanding the statutory provisions governing apportionment of costs among constituent school districts of a regional school district as set forth in <u>N.J.S.A.</u> 18A:13-23, in a situation substantially similar to that present in [<u>North Haledon</u>]. <u>Specifically, the Commissioner may determine cost allocations among and between the constituent districts where there is the presence of an inequitable tax burden -- which could be demonstrated by a constituent district unsuccessfully seeking to change the apportionment methodology -- and due to a constitutional imperative such as addressing racial segregation, the Board of Review (or a court reviewing the Board's determination) determines that the regional district must remain intact.</u>

[(Emphasis added).]

By letter of January 18, 2005, the Commissioner advised that cost apportionment in North Haledon would be sixty-seven percent equalized valuation and thirty-three percent pupil enrollment, phased in over four years. In so doing, he cautioned:

A-0743-10T4

> I stress that the apportionment methodology [adopted] is a unique response to the circumstances existing in the present matter, and that it is neither binding on the regional district in the event that the voters of the district and its constituents subsequently elect to approve a cost apportionment method of the regional board's own devising pursuant to N.J.S.A. 18A:13-23, nor intended to be precedent-setting in any other situation where cost apportionment is at issue among the constituent members of a regional district.

On numerous occasions both before and after North Haledon, the Legislature has considered issues involving regional school districts, including its funding and the procedures for withdrawal from or dissolution of such districts, but no significant changes have been made. Seaside Park has been an active participant in those discussions.

For example, in 1994, the Senate introduced S. 1313, which would have made it easier for a district to withdraw from a limited purpose regional school district, but it was not enacted. In 1996, the Legislature established a panel to investigate regionalization. L. 1996, c. 138, § 31. The New Jersey Regionalization Advisory Panel issued its final report in January 1998. See N.J. Regionalization Advisory Panel Final Report (Jan. 1998), http://www.njleg.state.nj.us/PropertyTaxSession/OPI/FinalReport.pdf. It recognized the disincentives to regionalization, including, in part, tax

apportionments, and encouraged regionalization and the increased use of shared services to improve efficiency and maximize facilities and professional resources available to local districts. Id. at 2, 6-7. The Panel also recommended "legislation that would direct and empower the Commissioner of Education, supported by the county superintendents and in cooperation with the local boards of education and administrations, to identify school districts that might benefit financially and educationally from either regionalization or consolidation of services with other school districts[,]" and legally mandated regionalization where appropriate. Id. at 2.

Also in 1996, the Assembly created a task force on school district regionalization "to examine and develop recommendations concerning issues associated with the regionalization of schools, including but not limited to: apportionment of costs; incentives and disincentives for regionalization; the financial impact of State aid on regionalization; and cost savings to taxpayers." Assem. Res. 127, 206th Leg. (Nov. 14, 1996). The task force was continued in the 1998-1999 legislative session, see Assem. Res. 1, 208th Leg. (Jan. 13, 1998), and it held

14                                                              A-0743-10T4

hearings on February 25, 1998, March 26, 1998, and August 13, 1998.[5]

On February 25, 1999, the task force issued a report on its findings and recommendations.  See Assembly Task Force on School District Regionalization Findings and Recommendations, http://www.njleg.state.nj.us/legislativepub/reports/school.pdf. It found, in pertinent part, that:

> 4.    The disproportionate distribution of costs among constituent municipalities in regionalized districts is a major disincentive to regionalization.  However, any formula change designed to bring parity in the per pupil costs of the constituent municipalities will result in "winners" and "losers."
>
> 5.    Smaller, more affluent communities in regional school districts, which are locked into paying based on their equalized valuation, as opposed to on a per-pupil basis, may wind up paying more than what they otherwise would pay in a non-regionalized district.
>
> 6.    Development trends of constituent municipalities within a regional school

---

[5]    The mayor of Seaside Park served as a member of the task force, which specifically considered the experience of Central Regional, Assembly Task Force on School District Regionalization, Transcript of Feb. 25, 1998, (pp. 84-94); Central Regional's expert in this litigation, Melvyn Wyns, testified at the March 26, 1998 hearing, Assembly Task Force on School District Regionalization, Transcript of March 26, 1998, (pp. 24-41, 64-67); and one of plaintiffs' experts in this litigation, James Kirtland, testified at the August 13, 1998 hearing, Assembly Task Force on School District Regionalization, Transcript of Aug. 13, 1998, (pp. 80-81, 98-120).

district can also negatively impact on the cost inequity factor.

. . . .

8. Many districts exhibit concern over regionalizing because the deregionalization process proves rigid and difficult. Major issues relating to division of debt service and assets, personnel retention policies, and the ability of each resulting district to adequately provide for the education of their students, must be considered.

9. Withdrawal from a regionalized arrangement by a constituent municipality may prove overwhelming since the current procedures require a majority of voters across the regional district in addition to a majority of voters in the constituent municipality which wants to exit from the arrangement.

The task force recommended, in pertinent part: (1) restructuring of regionalization agreements "to allow reassessment of cost distribution if the per pupil cost deviates by more than 10% between any two constituent municipalities of the regional district"; (2) modification of the equalized valuation method for apportioning costs to a "fairer formula" that would "provide more equity among constituent municipalities," with "a realistic mechanism which compels equitable adjustments in the distribution costs among constituent municipalities for the small number of existing regionalized districts which currently evidence an extreme disproportionate distribution of costs"; and (3) amendment of

the withdrawal statutes, allowing a municipality to opt out "without major obstacles when a specified threshold deviation in the per pupil amount paid by each constituent municipality is reached, perhaps 10%" and providing a mechanism "to join another regional district or enter into a sending/receiving relationship with another regional district."  Ibid.

In 2002, the Legislature considered S. 295, which would have reduced per-pupil cost disparities in certain regional school districts and increased state aid to those districts to offset the reduction in municipal contributions.  Central Regional supported the measure, but it did not pass.

In 2005, the Office of Legislative Services (OLS) issued a Background Report, Regional School Districts:  Apportionment of Costs in the Constituent Municipalities (July 20, 2005).[6]  The OLS acknowledged the disincentives to regionalization, including the perception of inequity felt by wealthier municipalities paying based upon equalized property value.  It also noted the difficulty in altering the funding method for currently existing regional school districts:

> A referendum on a change in the apportionment method must be approved "by the voters of each municipality."  Because of this voting requirement, a change in the method of cost apportionment is quite

---

[6] http://www.njleg.state.nj.us/PropertyTaxSession/OPI/bg123.pdf.

A-0743-10T4

difficult to accomplish. Such a change will always create "winners" and "losers" among the constituent municipalities, and those municipalities slated to "lose" will not vote in favor of a change that will result in increases in their tax levy. The constituent municipalities which benefit from the current apportionment method are granted effective veto power over any possible change.

In 2006, the Legislature created four joint legislative committees to make recommendations regarding proposals to reform property taxes, including the Joint Legislative Committee on Public School Funding Reform and the Joint Legislative Committee on Government Consolidation and Shared Services. Assem. Con. Res. 3, 212th Leg. (July 28, 2006). The Consolidation and Shared Services Committee held hearings during which it considered, among other items, consolidation of school districts;[7] however, its November 15, 2006 report did not specifically address regional school districts. See 2006 Special Session Joint Legislative Committee Government Consolidation and Shared Services Final Report (Dec. 1,2006), http://www.njleg.state.nj.us/PropertyTaxSession/OPI/jcgo_final_ report.pdf.

---

[7] Plaintiffs' counsel testified regarding regional school districts at the November 1, 2006 hearing. See Transcript of Public Hearing before Joint Legislative Committee on Government Consolidation and Shared Services, pp. 33-38 (Nov. 1, 2006), http://www.njleg.state.nj.us/legislativepub/pubhear/jcgo110106. pdf.

A-0743-10T4

Following hearings, the Funding Reform Committee issued its final report in December 2006. See Special Session Joint Legislative Committee Public School Funding Reform Final Report (Dec. 1, 2006), http://www.njleg.state.nj.us/PropertyTaxSession/OPI/jcsf_final_report.pdf. Pertinent to the present appeal, the Committee recognized the value of regionalization as well as the financial disincentives to the creation of regional school districts, and recommended adopting the Department of Education's recommendations regarding the apportionment of costs in regional districts as follows:

> Under the revisions, State aid and local property tax contributions would be calculated separately for each constituent municipality in a regional district. [And] [n]o jurisdiction in a regional school district would pay a tax levy per pupil which exceeds the actual per pupil expenditures of the regional school district.
>
> While some may be concerned that this change would artificially cap the burden of some taxpayers who have a greater ability to pay under the measures employed, it is believed that the policy and educational benefits of having regional school districts outweigh this concern.

Also in 2006, S. 1585 was introduced, 212th Leg.,[8] which would have provided for the reduction of per pupil expenditures

_____

[8] S. 1585 can be traced back to A. 2623, from the 209th Leg. (2000-2001 Legislative Session). In 2001, A. 2623 was

(continued)

for certain constituent municipalities of regional school districts. It apparently was designed to eliminate the funding complained about by Seaside Park. It would have reduced the tax burden for municipalities that are constituents of regional school districts but: (1) comprise less than 10% of the regional school district enrollment; (2) have a tax levy to support the regional school district of more than $1 million; and (3) have a per pupil expenditure that is more than 200% of the average per pupil expenditure of all constituent municipalities of the regional district. State aid would have been provided to the regional school district to compensate for the loss of revenue from the constituent municipality. The bill, however, never proceeded beyond introduction, and it was not carried over or re-introduced in any more legislative sessions.

Additionally, A. 3261/S. 2289 and A. 3422 were introduced in 2008, 213th Leg., which were carried over or reintroduced as A. 1327/S. 1638 in 2010, 214th Leg. These bills would have revised the voting requirements necessary for the dissolution of

_____

(continued)
introduced, referred to two assembly committees, and also reported out of committee with a second reading and fiscal estimates (with Seaside Park identified in the 2001 fiscal estimate as one of the municipalities that would experience tax savings). However, it did not pass, and was carried over in legislative sessions through 2006, introduced as S. 1585, but never went anywhere.

limited purpose regional school districts.  They would have made dissolution easier by eliminating the requirement that there be a majority of the overall vote as cast; instead, dissolution could occur with an affirmative vote in a majority of the individual constituent districts.  However, the bills did not progress past introduction in either legislative session.

## II.

We turn now to the specifics of our case.  In the early 1950s, Seaside Heights, Seaside Park, Island Heights, Ocean Gate, Berkeley Township, and Lacey Township sent students to Toms River schools on a tuition basis.  In 1953, however, Toms River advised that it could no longer continue that relationship.  By public referendum held in 1954, the six municipalities formed Central Regional as a limited purpose school district to educate their junior and senior high school students (grades seven to twelve).[9]  Central Regional's school buildings are located in Berkeley Township, which is the largest municipality in terms of geography, population, registered voters, and student enrollment.

---

[9] The boards of education of the constituent municipalities passed resolutions to hold July 1 and September 1, 1954 referenda to allow voters to decide whether to create the District.  The first referendum did not pass; the second passed.

In the 1954 referendum by which Central Regional was formed, the voters agreed to apportion costs based on per pupil enrollment. However, the 1975 legislation altered Central Regional's funding mechanism to an equalized property valuation basis. L. 1975, c. 212. Although the 1993 legislation allowed for changes to the funding structure of regionalized school districts, no such change has ever been effectuated at Central Regional.

In 1976, Seaside Heights, Seaside Park, and Lacey Township petitioned the Department of Education for permission to withdraw from Central Regional. On May 20, 1977, the Board permitted Lacey Township to conduct a referendum, but rejected the petitions of Seaside Heights and Seaside Park on the ground that the proposed alternative to Central Regional, a sending-receiving relationship with the Point Pleasant School District, was not viable. Lacey Township's withdrawal from Central Regional was approved by voter referendum held in 1977.[10]

In 1981, Island Heights and Seaside Heights passed resolutions requesting that the county superintendent investigate the advisability of their withdrawal from Central Regional. Island Heights later withdrew its petition after a

---

[10] The withdrawal became effective on July 1, 1978, but for ease of reference in this opinion we will use the 1977 date.

A-0743-10T4

joint meeting of the constituent communities, and the county superintendent issued his report regarding Seaside Heights.  In l983, Seaside Heights then petitioned the Commissioner for permission to conduct a referendum regarding withdrawal. Seaside Park objected, and the Board denied the petition.

In 1985, the Berkeley Township Board of Education (the respective Boards of Education will hereafter be referred to as BOE) commissioned a feasibility study regarding its potential withdrawal from Central Regional.  The author recommended withdrawal, but there is no record of any further action.

In November 1995, the Seaside Park BOE approved withdrawal from Central Regional and pursued a send-receive relationship with Point Pleasant under a pilot program.  However, this attempt to withdraw was unsuccessful.

In October 1998, Seaside Park passed a resolution requesting that Central Regional consider the resolution "as a petition seeking an alteration in the formula for municipal contributions to the District, so as to return to a per pupil cost formula[.]"  The resolution otherwise reflected an intent by Seaside Park "to seek all appropriate legal redress to withdraw" from Central Regional.  The resolution also directs the Borough Clerk-Administrator to promptly forward it to Central Regional.  The record reflects that Central Regional

received the resolution and discussed it, but does not reflect any decision by Central Regional or further action by Seaside Park regarding the resolution.

In 2003, Seaside Park adopted a resolution requesting that Central Regional place a referendum on the ballot for voters in the constituent municipalities authorizing a change in the funding formula for Central Regional to sixty percent equalized valuation and forty percent per pupil. In contrast to the prior resolution, this resolution contained no provision directing its submission to Central Regional and the record does not reflect anything further with respect to this resolution, including whether it was sent to Central Regional.

In April 2005, at Seaside Park's request, Donald E. Beineman, Ed.D., and James L. Kirtland, C.P.A., prepared a preliminary feasibility study, opining that Seaside Park was subsidizing the other constituent municipalities and could realize significant cost savings by withdrawing from Central Regional and entering into a sending-receiving relationship with nearby Toms River or Point Pleasant, or by Central Regional being dissolved and Berkeley Township creating its own K-12 district. Accordingly, in June 2005, Seaside Park and its BOE passed resolutions formally instituting the instant process by requesting that the Ocean County Superintendent of Schools

conduct an investigation into the advisability of Seaside Park's withdrawal from, or the dissolution of, Central Regional pursuant to N.J.S.A. 18A:13-51. Seaside Heights and Island Heights and their Boards of Education passed resolutions requesting an investigation as to only the dissolution of Central Regional.

Central Regional retained its own school finance consultant, Melvin L. Wyns, who authored a report in November 2005. He recommended opposition to both dissolution and withdrawal based on the adverse tax impact it would have on the constituent municipalities.

In March 2006, the county superintendent issued a report advising against dissolution. He found the following advantages to dissolution: reduced administrative costs by consolidation, anticipated increases in state aid for select districts, reallocation of the tax levy, and the ability of each school district to assess and evaluate their present educational concerns during the process. He found the following disadvantages: possible lack of continuity of educational programs, need to establish new relationships between sending and receiving districts, effects on staff at Central Regional and Berkeley Township elementary school regarding tenure and seniority, negative tax levy impact on Berkeley Township and

A-0743-10T4

Ocean Gate, potential increased cost per student ratios in Berkeley Township, and lost ability to share unique costs among all constituent districts. The superintendent concluded the disadvantages of dissolution outweighed the advantages. Most notable was the negative impact on the taxpayers of Berkeley Township and Ocean Gate, "who represent over 80% of the resident population."

In April 2006, Seaside Park and its BOE filed a petition with the State Department of Education seeking permission to conduct a referendum on withdrawing from or dissolving Central Regional pursuant to N.J.S.A. 18A:13-54. They requested, in the event the Commissioner denied a referendum or the referendum was defeated, that she "use her inherent power to create an equitable tax apportionment formula, based in whole or in part on a per-pupil formulation, to fund the Central Regional School District." Central Regional opposed the petition.

The Board held hearings in July and August 2006. It voted to grant Seaside Park's petition for a referendum on dissolution of Central Regional, memorialized in a written opinion of September 1, 2006. See N.J.S.A. 18A:13-56. The referendum was held on March 13, 2007, and was defeated by the voters because although the majority of the constituent municipalities favored dissolution, a majority of the overall voters in the District

did not.  See N.J.S.A. 18A:13-59.  The referendum passed in Seaside Park, Seaside Heights, and Island Heights, but was defeated in Berkeley Township and Ocean Gate.[11]

### III.

In May 2007, plaintiffs filed a complaint in the Chancery Division, commencing this litigation, and a month later filed a first amended complaint.  Defendants and cross-appellants filed responsive pleadings, and the Seaside Heights BOE filed a third-party complaint.  Island Heights and its BOE and the Seaside Heights BOE sought dissolution of Central Regional, consistent with the expressed desire of the majority of the voters in their municipalities.  Alternatively, the Seaside Heights BOE sought permission to withdraw with Seaside Park, but Island Heights did not seek to withdraw.  Both municipalities opposed Seaside Park's unilateral withdrawal.  Moreover, neither Seaside Heights nor Island Heights, or their respective Boards of Education, sought alteration of the current funding formula.

In December 2007, plaintiffs filed a second amended complaint seeking an order:  (1) compelling the Commissioner to exercise her inherent equitable powers to dissolve Central

_____

[11] At that time, Berkeley Township had about seven times the number of registered voters of Seaside Heights, Seaside Park, and Island Heights, combined.  Moreover, Berkeley Township had 1709 pupils in the District while Seaside Heights, Seaside Park, and Island Heights had a total of 311 pupils in the District.

Regional, permit Seaside Park to withdraw, or change Central Regional's funding method because the current allocation system is inequitable as applied to them (count one); (2) declaring the 1975 and 1993 school funding legislation unconstitutional as applied to plaintiffs because it impairs their contractual right to per pupil funding (count two); (3) declaring the subject legislation unconstitutional as applied to plaintiffs because it constitutes a taking of their property right to per pupil funding without just compensation (count three); (4) requesting the court exercise its equitable power to dissolve Central Regional, permit plaintiffs' withdrawal, or change the funding method for Central Regional because the statutory remedy is illusory due to the larger number of voters in Berkeley Township (count four); (5) declaring the subject legislation violative of plaintiffs' procedural due process because it provides Berkeley Township with the absolute power to block any change in the allocation method (count five); (6) declaring the subject legislation violative of plaintiffs' substantive due process because the amendments are not rationally related to any alleged legislative objective and deprive them of their property (tax dollars and contract rights) (count six); and (7) declaring the current allocation method does not provide Seaside Park's students with an efficient system of education because of the

28                                                          A-0743-10T4

disproportional monetary burden on its taxpayers (count seven). Defendants filed responsive pleadings.

Prior to the second amended complaint being filed, the Commissioner and Berkeley Township moved to dismiss the complaint and cross-complaint. Central Regional and the Berkeley Township BOE joined in the motion. Plaintiffs opposed the motion on the basis that the statutory procedure for withdrawal or dissolution is illusory given the disparity of voter registration in Seaside Park and Berkeley Township. Following argument, Judge Frank A. Buczynski, Jr. issued an oral decision and order on February 21, 2008, dismissing several of the claims and remanding an issue for clarification by the Commissioner.

The Commissioner had sought dismissal of the amended complaint on the grounds of plaintiffs' failure to exhaust all administrative remedies of modification of the current funding allocation, permission to withdraw from the District, and dissolution of the District. See N.J.S.A. 18A:13-23.3, -54, -55, -56, and -57. The court noted that Seaside Park had passed a resolution petitioning Central Regional to alter the formula for municipal contributions in 1998 under N.J.S.A. 18A:13-23, which apparently was ignored; however, plaintiffs waited a decade to seek judicial review or assistance to compel

compliance. Accordingly, the court concluded that plaintiffs had not exhausted their statutory remedies for modification of the current funding method for Central Regional. Dissolution, however, had already been voted upon by the constituent municipalities and rejected. The order thus reflected that count one was dismissed with prejudice insofar as plaintiffs and third-party plaintiffs sought an order directing the Commissioner to exercise any authority to dissolve or permit withdrawal from the District.

The remaining claims in count one relating to the statutory process for modifying the regional funding allocation method and the statutory procedures for withdrawal of constituent municipalities were dismissed without prejudice. The order further provided that "[a]s to the claim that plaintiffs have not exhausted all administrative remedies," any public body can request in writing pursuant to N.J.S.A. 18A:13-23 that Central Regional consider holding a referendum to change the current regional funding allocation, and failure of Central Regional to timely respond will be deemed a denial of the request.

The court, however, remanded the matter to the Commissioner "for clarification as to whether the Board of Review considered the petition for an order to conduct a referendum on the issue of withdrawal on the merits." The court required the Board to

advise in writing that it addressed the issue of withdrawal, or if it did not, to consider the issue "as directed by the Commissioner."

The court also dismissed the constitutional claims (counts two, three, five, and six) with prejudice as brought by the governmental entities, but denied the motion to dismiss as to the individual taxpayer plaintiffs. Specifically, the court held that Seaside Park and its BOE lacked standing to pursue the claims of impairment of contracts, taking of property, and procedural and substantive due process violations based on the principle, with citing reference, that municipalities and their boards of education as political subdivisions generally lack standing to assert constitutional claims against other political bodies such as the Commissioner.

The court further dismissed counts four and seven with prejudice as to all parties based on a failure to state a claim. As to count four, the court held that the mere fact a constituent municipality may vote against the relief requested in a referendum does not make the remedy illusory as a matter of law, noting Lacey Township's withdrawal from the District following the 1975 revision. As to count seven, the court found that plaintiffs failed to challenge any of the ten elements of a

31

"thorough and efficient" education articulated in <u>Abbott II</u>, <u>supra</u>, 119 <u>N.J.</u> at 350 n.23.

The only claims that survived the court's February 21, 2008 decision were those constitutional claims asserted on behalf of the taxpayer plaintiffs in counts two, three, five, and six. Specifically, those claims alleged that the 1975 and 1993 laws: (1) substantially impaired taxpayer plaintiffs' "contracts" with the regional district; (2) constituted a taking of property without just compensation; (3) violated taxpayer plaintiffs' procedural due process rights; and (4) violated taxpayer plaintiffs' substantive due process rights.

Plaintiffs moved for reconsideration. Following oral argument on May 9, the court denied the motion on the record, memorialized in an order of June 9, 2008.

On May 19, 2008, the Commissioner notified Judge Buczynski that the Board only considered the issue of dissolution and not whether Seaside Park should be granted a referendum on withdrawal. She explained that in Seaside Park's petition, the withdrawal relief was only requested in the alternative if the Board denied its request for a referendum on dissolution, which it did not.

By resolution dated September 10, 2008, Seaside Park applied to the county superintendent for another investigation

into the advisability of Seaside Park's withdrawal from Central Regional. Our record reflects no proceedings on this application.

In response to the court's February 21, 2008 decision, by resolution of February 27, 2008, Seaside Park requested that Central Regional conduct a public referendum regarding a revised funding formula. On April 21, 2009, a referendum was held with respect to altering Central Regional's cost allocation method from equalized valuation to per pupil cost. It did not pass.

Seaside Park also pursued modification of the District's funding formula with the Department of Education. By letters dated March 11, May 16, and July 29, 2008, the Mayor of Seaside Park sought the Commissioner's assistance and support in resolving the "inequitable tax apportionment" in Central Regional. The Commissioner responded to each of the letters, and in her letter of August 18, 2008, advised that the Department had reviewed the data Seaside Park provided and was aware of the per pupil costs borne by the constituent members of Central Regional. She added:

> The situation you described is not unlike that of many other constituent municipalities involved in regional districts where there is simultaneously a wide disparity in property value and enrollment among the constituents. As you correctly pointed out, the existing tax apportionment methodology, and any attempt

33

to change it, is governed by statute. I recognize that it is often difficult and sometimes impossible to get the statutory voting majorities to effect the coveted change. Unfortunately, as Commissioner I cannot impose that change, as I too must adhere to the existing statute. However, with the recent passage of laws giving the Executive County Superintendent a wide range of authority to seek out and recommend programs and services that lead to increased efficiency at the district level, I will ask that your district receive swift attention in this matter.

It is my hope that in cooperation with the county office it may be possible to find a solution to your problem that would be acceptable to all of the parties involved, and one that will not harm the school district's ability to provide a quality public school education to all of the children.

In 2010, the parties filed cross-motions for summary judgment. Following oral argument, by opinion and order of August 30, 2010, Judge Buczynski denied plaintiffs' motions and granted defendants' motions dismissing the remaining counts (two, three, five, and six) as to the taxpayer plaintiffs. The judge found "[t]he record [was] bereft of any evidence supporting the existence of a contractual relationship between the parties[,]" expressly concluding the resolutions of the constituent districts to hold the 1954 referenda to allow voters to decide whether to create the District did not meet the requirements of a valid contract. Nor was there a "taking"

because "[p]laintiffs did not hold a property right in the original funding formula." Similarly, the judge held that "[p]laintiffs were not denied substantive due process because [they] did not hold a fundamental right in the funding scheme used for the District."

Judge Buczynski was also convinced that pursuing the "drastic remedy" of "exercising control over the Commissioner and usurping her authority is not warranted under the ['undisputed material'] facts of this case" and granting the extraordinary equitable remedies sought by plaintiffs of "court ordered dissolution of the District, or court permission allowing Seaside Park to withdraw, or court ordered modification of the funding formula, . . . without a finding of constitutional violations[,] would be an abuse of judicial discretion."

He concluded:

> Property owners' dissatisfaction with the current funding formula or their belief that it is unfair is not a basis for the court to intrude into what is a Legislative prerogative. Central Regional School District was created under terms and conditions outlined by our Legislature. Moreover, the funding formula was determined by the Legislature. Controlling costs for education is one of several significant issues facing our State. Our Governor and Legislature are facing complex economic challenges. It is the Legislature's obligation to provide for a thorough and

35

efficient education as mandated in Article VIII, Section 4, Paragraph 1 of the New Jersey Constitution. Therefore, it is for the Legislature to determine if the current educational funding used in Central Regional School District should be revised or repealed, not the court.

Plaintiffs appealed. Seaside Heights BOE and Island Heights and its BOE cross-appealed.

On appeal, plaintiffs argue:[12]

POINT I[13]
THE TRIAL COURT ERRED IN DISMISSING, ON THE PLEADINGS ALONE, COUNTS ONE, FOUR, SIX, AND SEVEN, BECAUSE EACH COUNT SETS FORTH A VALID CAUSE OF ACTION.

A. The Trial Court Erred In Finding That Plaintiffs Had Not Exhausted Their Administrative Remedies And, As A Result, Dismissing Count One.

l. The trial court erred in finding that Plaintiffs failed to pursue withdrawal from Central.

2. The trial court erred in finding that Plaintiffs failed to pursue modification of the cost allocation method.

B. The Trial Court erred In Finding That The Commissioner Has No Equitable Authority To Modify A Regional District's Funding Formula.

_____

[12] Plaintiffs' arguments regarding counts two, three, five, and six do not challenge the court's ruling that Seaside Park and its BOE lacked standing.

[13] We renumber plaintiffs' arguments as their Point I sets forth the standard of review.

l. The trial court erred by dismissing an issue of "first impression" at the pleadings stage.

2. Plaintiffs are entitled to equitable modification of the tax allocation method for Central pursuant to the Supreme Court's decision in North Haledon.

C. The Trial Court Erred By Dismissing Count Four Because Plaintiffs Raised A Cognizable Claim That The Statutory Processes For Modification Of The Cost Apportionment For, As Well As Withdrawal From Or Dissolution Of, Central Are Illusory.

D. The Trial Court Erred By Dismissing Count Seven Because Plaintiffs Raised A Cognizable Claim That The Current Method Of Cost Apportionment For Central Does Not Provide Plaintiffs With An Efficient System Of Education For Their Students.

POINT II
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO COUNT TWO BECAUSE THE LEGISLATION AT ISSUE VIOLATED THE CONTRACTS CLAUSES OF THE U.S. AND NEW JERSEY CONSTITUTIONS AS APPLIED.

A. The Trial Court Erred In Ruling That, As a Matter of Law, There Was No Contract Between The Various Parties.

B. The Trial Court Erred In Ruling That, As a Matter of Law, Plaintiffs Were Not The Third-Party Beneficiaries Of The Contract At Issue.

C. The Trial Court Failed To Analyze The Substantial Impact Prong Of The Analysis.

37

D. The Trial Court Erred In Finding That The Legislation At Issue Furthers A Legitimate Public Purpose.

POINT III
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO COUNT THREE BECAUSE THE LEGISLATION AT ISSUE CONSTITUTED AN UNCONSTITUTIONAL TAKING OF THE PLAINTIFFS' PROPERTY RIGHTS.

POINT IV
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO COUNT SIX BECAUSE THE 1975 REVISION VIOLATED PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS.

POINT V
THE TRIAL COURT ERRED WHEN IT REFUSED TO ADDRESS PLAINTIFFS' EQUITABLE CLAIMS AND SUBSTANTIVE DUE PROCESS CLAIMS.

POINT VI
PLAINTIFFS DEMONSTRATED GOOD AND JUST CAUSE FOR THE TRIAL COURT TO EXERCISE ITS EQUITABLE POWERS TO ADDRESS THE INEQUITIES OF THE CURRENT SITUATION.

At oral argument before us, counsel for Seaside Park advised that it sought the direct relief of a judicial determination on the merits, permitting it to dissolve or withdraw from Central Regional, or to modify Central Regional's cost allocation method. Alternatively it sought a remand to the Commissioner with direction to apply North Haledon remedies.

In its cross-appeal, the Seaside Heights BOE argues that the court erred in dismissing all counts of its complaint upon a finding that it lacked standing to assert constitutional claims.

At oral argument before us, its attorney reiterated that it joined plaintiffs' request for dissolution of Central Regional or alternatively supported the withdrawal of Seaside Park and Seaside Heights, but did not support unilateral withdrawal by Seaside Park or revision of the tax apportion formula.

The Island Heights BOE asserts error by the court in: (1) dismissing count four because the evidence supported a cognizable claim that the statutory process is an illusory remedy; (2) granting summary judgment dismissing count two because the legislation violated the contracts clauses of the United States and New Jersey Constitutions as applied; (3) granting summary judgment as to count three because the legislation constituted an unconstitutional taking; and (4) granting summary judgment dismissing count six because the 1975 legislation violated the parties' due process rights. It further contends the evidence before the court demonstrated good and just cause to address the inequities of the current situation by ordering dissolution of the District.

Island Heights' arguments echo the abovementioned second, third, and fourth arguments. It additionally contends the court should have accepted the allegations of the complaint as true for purposes of the dismissal motion including, for example, that the referenda were contracts, that taxpayer plaintiffs were

third-party beneficiaries of the contract formed by the 1954 referenda, that the l975 and l993 revisions substantially impaired any contractual relationship plaintiffs may have had with the other members of the District, and that plaintiffs had a property interest as to the 1954 referenda. It further contends that material factual questions existed as to whether the l993 revision allowed for a realistic means for a municipality to remove itself from the District and whether the funding changes mandated by the l975 revision violated the constitutional rights of the residents of the plaintiff municipalities. At oral argument before us, the attorneys for Island Heights and its BOE reiterated that they joined plaintiffs' request for dissolution of Central Regional; however, they did not support unilateral withdrawal by Seaside Park or revision of the tax apportion formula, and Island Heights did not seek withdrawal from the District if it were not dissolved.

IV.

The Commissioner argues that the cross-appeals filed by Island Heights and its BOE should be dismissed under Rule 2:8-2 because they lack standing to appeal from the dismissal of claims they did not assert in the trial court. The Commissioner notes that the Seaside Heights BOE filed cross-claims asserting

the same causes of action as plaintiffs but neither Island Heights nor its BOE asserted affirmative claims other than a counterclaim for indemnification and cross-claims for contribution and/or indemnification.

Only parties aggrieved by a judgment may appeal, meaning those with "a personal or pecuniary interest or property right adversely affected by the judgment in question." Howard Sav. Inst. v. Peep, 34 N.J. 494, 499 (1961). Island Heights and its BOE did not file any affirmative claims for relief. Thus, although they supported plaintiffs' prayer for dissolution of the District, they were not aggrieved by the final judgment. See Donofrio v. Farr Lincoln Mercury, Inc., 54 N.J. Super. 500, 504-07 (App. Div. 1959). Nevertheless, considering the compelling public policy and public interest at stake, Tiger v. Am. Legion Post, 125 N.J. Super. 361, 371 (App. Div. 1973), and the fact that we will be addressing Island Heights' and its BOE's arguments in the context of plaintiffs' appeal, we discern no basis to dismiss their cross-appeals at this juncture.

We first address and reject plaintiffs' and the Island Heights BOE's arguments that the court did not apply the proper standard for a motion to dismiss and should have permitted plaintiffs to develop their claims through discovery, and that

there were genuine issues of material fact precluding summary judgment in defendants' favor.

"Appellate review of an order dismissing an action [under Rule 4:6-2(e), for failure to state a claim upon which relief may be granted] is governed by a standard no different than that applied by the trial courts." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250 (App. Div. 2002). The court examines the legal sufficiency of the facts alleged on the face of the complaint, doing so with liberality, and accords every reasonable inference to the plaintiffs. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). Dismissal of a complaint, however, "is mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted." Rieder v. N.J. Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987).

We review the grant of summary judgment de novo, applying the same standard used by the motion judge under Rule 4:46. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010); Chance v. McCann, 405 N.J. Super. 547, 563 (App. Div. 2009). We first consider whether the moving party has demonstrated that there are no genuine disputes as to material facts, viewed in the light most favorable to the non-moving party, i.e., "whether the competent evidential materials presented, when viewed in the

light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issues in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). If the evidence is "'so one-sided that one party must prevail as a matter of law,'" then summary judgment should be granted. Brill, supra, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202, 214 (1986)). We then decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 231 (App. Div.), certif. denied, 189 N.J. 104 (2006). In so doing, we accord no deference to the motion judge's conclusions on issues of law, Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83 (2010); Manalapan Realty, L.P., v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), which we review de novo.

Based on our review of the record, we are satisfied Judge Buczynski applied the appropriate legal standards in the challenged orders. Plaintiffs were afforded all favorable inferences as to their allegations of fact pertaining to the resolutions, referenda, studies, and financial inequalities of the funding formula. Their challenges on appeal with respect to

this issue, however, involve legal conclusions, such as whether the municipal entities had standing; whether those facts created a contract, property right, or established other prima facie constitutional claims; or whether those facts justified the extraordinary relief of an exception to the doctrine of exhaustion of administrative remedies or a unique North Haledon remedy. For the reasons set forth in the judge's comprehensive oral decisions and written opinion, we are satisfied he provided ample legal basis for dismissing some of the counts under Rule 4:6-2(e), and the balance of the complaint subsequently on cross-motions for summary judgment.

## A. Count One - Exhaustion of Remedies

In their first count, plaintiffs sought an order compelling the Commissioner to use her "inherent power" as set forth in North Haledon to provide them with equitable relief in the form of dissolution of Central Regional, authorization for Seaside Park's withdrawal from Central Regional, or modification of the cost apportionment used by Central Regional. In February 2008, Judge Buczynski dismissed this count on the ground that the referendum had been unsuccessful on dissolution and plaintiffs had failed to exhaust their administrative remedies regarding withdrawal from the District or alteration of the District's funding formula. He directed plaintiffs to pursue alteration of

44

the funding formula through the statutory mechanism, i.e., an updated request to Central Regional, and remanded to the Commissioner for consideration of plaintiffs' alternative request for a referendum on withdrawal.

Then, at plaintiffs' request, Central Regional held a referendum for alteration of the District's funding formula, which failed. Seaside Park requested similar relief in letters to the Commissioner, who responded that she had no authority to do so. In response to the trial court's remand, the Commissioner advised that she had only considered plaintiffs' alternative request for dissolution, which she had authorized by referendum.

Plaintiffs first assert error by the court in finding they had not exhausted their administrative remedies as to withdrawal and modification of the cost apportionment formula. They urge that they diligently sought relief from Central Regional and the Commissioner to no avail. Plaintiffs point to the fact that all of the feasibility studies addressed both Seaside Park's withdrawal from and dissolution of Central Regional and they sought alternate relief from the Commissioner. Nevertheless, the Commissioner chose to only act on their request for a referendum on dissolution, which was defeated by the voters in March 2007. Plaintiffs also contend they made repeated requests

after 1998 to have the funding method changed, which Central Regional ignored, a fact the court failed to consider in its exhaustion analysis.

Plaintiffs further argue that mandating the exhaustion of remedies would be futile. They note that the referenda on dissolution and altering the cost apportionment formula failed, and posit that even if the Commissioner approved a referendum on withdrawal, it likely would not succeed given that Berkeley Township has more total voters than the other constituent municipalities combined.

Requiring exhaustion of administrative remedies before seeking judicial relief is a tenet of administrative law and established by court rule. See Abbott v. Burke, 100 N.J. 269, 296 (1985) ("In general, available and appropriate 'administrative remedies should be fully explored before judicial action is sanctioned.'") (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 558 (1979)); R. 2:2-3(a)(2). The exhaustion requirement serves three primary goals: (1) it ensures that claims are initially heard by the body with expertise in the area; (2) it produces a full factual record facilitating meaningful appellate review; and (3) it conserves judicial resources because the agency decision may satisfy the parties. Bd. of Educ. of Bernards v. Bernards Twp. Educ. Ass'n,

79 N.J. 311, 317 (1979). We also have recognized the Department of Education's "fundamental and indispensable jurisdiction" over controversies and disputes arising under the school laws, and have held that the doctrine of exhaustion of remedies requires parties to attempt resolution of such matters using the administrative process. Theodore v. Dover Bd. of Educ., 183 N.J. Super. 407, 412-14 (App. Div. 1982).

Nevertheless, exhaustion of remedies is not an absolute prerequisite to litigation. N.J. Civ. Serv. Ass'n v. State, 88 N.J. 605, 613 (1982).

> Exceptions are made when the administrative remedies would be futile, when irreparable harm would result, when jurisdiction of the agency is doubtful, or when an overriding public interest calls for a prompt judicial decision. We have frequently held that in a case involving only legal questions, the doctrine of exhaustion of administrative remedies does not apply.
>
> [Ibid. (internal citation omitted).]

Thus, "except in those cases where the legislature vests exclusive primary jurisdiction in an agency, a plaintiff may seek relief in our trial courts." Abbott, supra, 100 N.J. at 297.

We are satisfied that plaintiffs did not exhaust their administrative remedies as to withdrawal and failed to demonstrate why the doctrine should not be invoked under the

circumstances of this case. The case can and should be considered in the first instance by the Commissioner pursuant to the statutory scheme. The Legislature established a process for constituent municipalities to seek to withdraw from a regional school district. N.J.S.A. 18A:13-51 to -59. The statutory mechanism provides that the Board is the sole entity that can grant a petition for permission to conduct a referendum on the issue of dissolution or withdrawal. N.J.S.A. 18A:13-56. Plaintiff's April 27, 2006 petition requested that the Board, pursuant to N.J.S.A. 18A:13-56, authorize a referendum on the issue of dissolution of Central Regional and expressly pled that if that request were "not to be considered, the Board should authorize an alternative referendum on the withdrawal of Seaside Park." (Emphasis added).

Plaintiffs received the relief they requested; the Board followed the statutory process and granted plaintiffs permission to hold a referendum on the issue of dissolution of Central Regional as set forth in a detailed letter of September 1, 2006. Rather than pursuing their alternate relief of withdrawal through the administrative channels as mandated by the Legislature, plaintiffs filed suit. In an abundance of caution, Judge Buczynski remanded that issue to the Commissioner for clarification, and we are satisfied an appropriate explanation

was provided for the Board's decision solely on the issue of dissolution.

We are also not persuaded by plaintiffs' argument of futility based on the premise that that even if Seaside Park secured a referendum on withdrawal, the resulting tax increase and the veto power held by Berkeley Township virtually ensure that passage of such a referendum would never occur. A speculation is insufficient. See Harrow v. Prudential Ins. Co., 279 F.3d 244, 249 (3d Cir. 2002) (requiring a plaintiff to make a "'clear and positive showing of futility'" to warrant waiver of the exhaustion requirement) (citation omitted)). We recognize that Seaside Park has an uphill battle but as noted by Judge Buczynski, the remedy is not illusory, as evidenced by Lacey Township's withdrawal in 1977. Circumstances and attitudes of voters change over time. For example, we cannot speculate as to the potential impact of Superstorm Sandy in October 2012 on the pupil enrollment and tax base of Seaside Park and the other constituent municipalities in the District. The Legislature was well aware of this fluidity when it enacted and revised the statutes in Title 18A that created and implemented the comprehensive scheme regarding regional school districts.

Contrary to plaintiffs' assertion, the record amply supports the court's factual finding that Seaside Park slept on its rights after it passed the 1998 Resolution petitioning Central Regional to alter the formula for municipal contributions. Discovery did not "produce evidence that at least one request was made each year for the 3 or 4 years leading up to the filing of the Complaint." Plaintiff David Meyer's testimony was vague, couched in terms of "I believe," was non-specific as to dates, and was largely based on information provided to him from unidentified persons. No document was provided other than the 1998 and 2003 Resolutions and, as previously noted, no testimony or evidence was presented that the 2003 Resolution was, in fact, sent to Central Regional. Judge Buczynski correctly concluded that plaintiffs were not entitled to judicial intervention on this issue. He advised Seaside Park to pursue its statutory remedy of adopting and forwarding a new resolution to Central Regional requesting a referendum authorizing this relief, which it did. The referendum failed but the process was followed and the voters spoke, as anticipated by the Legislature in devising this comprehensive scheme.

A-0743-10T4

B.  Count One - Commissioner's Authority

Plaintiffs next contend the court erred in dismissing count one because, as they alternatively requested in their April 2006 Resolution, the Commissioner has inherent authority to alter Central Regional's funding formula under North Haledon to provide equitable relief to Seaside Park.  They emphasize that in both cases when the voters initially approved the formation of the regional school district, costs were to be apportioned on a per pupil basis, which funding method was changed to an equalized valuation by the 1975 revision.  See N. Haledon, supra, 181 N.J. at 165.  This resulted in a significantly disproportionate increase in the operating costs of both North Haledon and Seaside Park as compared with their constituent districts, even though their students only accounted for a small portion of the overall student body.  See id. at 166.

Seaside Park urges that its plight is "far worse than that which the Supreme Court identified as inequitable and disproportionate in North Haledon" and that it meets the two requisites to equitable relief as articulated by the Attorney General, i.e., that it is compelled to remain in the district and it is burdened with a disproportionate tax liability.  It argues that "[w]hile North Haledon was compelled to remain in the district due to the Court's belief that the Constitution

required it, Seaside Park is likewise compelled to remain in its district," against the wishes of ninety-five percent of its voters, "because the Legislature believed that the 1975 Revision, which imposed the current cost allocation method [and gave Berkeley Township and Ocean Gate a '$3 million incentive to keep Seaside Park a member of Central' Regional], was constitutionally required." Seaside Park also points to the growing inequitable burden placed on its taxpayers reflected in its charts, noting, for example, that in the 2009-2010 school year alone, its taxpayers paid about twelve times the per pupil amount than paid by the taxpayers of Ocean Gate and seven times more than that paid by the taxpayers of Berkeley Township.[14]

Even if we were to accept plaintiffs' argument that they exhausted their administrative remedies and are subject to a substantially inequitable allocation, they would not be entitled

---

[14] During the rebuttal portion of oral argument before us, counsel for Seaside Park mentioned as persuasive authority a pending matter in which the Borough of Oradell had made an application to the Commissioner for equitable relief, which the Commissioner apparently referred to an administrative law judge. Following argument, counsel submitted a January 24, 2012 letter from the Commissioner regarding that matter. The Deputy Attorney General on behalf of the Commissioner objected to the submission as it was not part of the trial record, plaintiffs did not move to supplement the record, and the parties were deprived of an opportunity to respond during the litigation. See R. 2:5-4, 2:5-5. The Commissioner's objection was appropriate, and we thus disregard this post-argument submission.

to the extraordinary equitable relief afforded in the North Haledon case.

Following passage of the 1993 amendment, North Haledon unsuccessfully pursued a referendum seeking to return the district to a per-pupil cost apportionment. Ibid. Here, however, as previously discussed, Seaside Park had not actively pursued a referendum seeking to return Central Regional to a per-pupil cost apportionment at the time of the court's dismissal of the first count. More critically, however, North Haledon's application for withdrawal was granted by the Board, and the referendum was successful. Id. at 172, 176-84. However, the Court having found it was one of "those rare circumstances" requiring judicial intervention with administrative action, id. at 176, compelled North Haledon to remain a member of a regional school district in order to maintain a racially diverse student body. Id. at 172, 176-84.

In this unique situation, the Court remanded the case to the Commissioner to implement an equitable cost allocation formula for North Haledon's regional school district, explaining:

> There is no suggestion in the record that North Haledon was racially motivated in petitioning for withdrawal; rather, North Haledon was justifiably concerned about the disproportional tax burden . . . carried by its citizens in relation to the other

constituent municipalities. We are not unaware of the frustration and anger expressed by the senior citizens of North Haledon who have fixed incomes and escalating property taxes. On the one hand, North Haledon lost a referendum on the question whether to alter the apportionment scheme because the statute, N.J.S.A. 18A:13-23, grants an effective veto power to Haledon and Prospect Park who benefit from the equalized valuation method North Haledon seeks to change. On the other hand, North Haledon cannot petition for withdrawal because of the impact of withdrawal on the racial balance of the students attending Manchester Regional.

We confronted a similar issue subsequent to our decision in Jenkins[ v. Township of Morris School District, 58 N.J. 483, 492-93, 504 (1971), where we held the Commissioner possessed the power and duty to act to prevent withdrawal of Morris Township students from Morristown High School and to compel a merger of the two districts to prevent de facto segregation]. After Jenkins issued, the Commissioner compelled the merger of the Morristown and Morris Township school systems. Twp. Comm. of Twp. of Morris v. Bd. of Educ. of the Twp. of Morris, 60 N.J. 186, 188 (1972). The boards of education from both towns recommended that the "allocation of costs between the component municipalities of the regional district be on the basis of apportionment valuations rather than pupil enrollment." Id. at 188-89. The Commissioner agreed, and ordered the new regional district to apportion costs in the manner suggested by the school boards. Id. at 189. The Township Committee of Morris Township filed suit, asserting the Commissioner lacked the power to impose an apportionment scheme on the new district. Id. at 189-90. The Township Committee argued that, under N.J.S.A. 18A:13-34, the power to set the

54

apportionment scheme had been conferred on the voters of a regional district. Id. at 190.

We rejected the Township's argument because "[t]he Commissioner's determination as to allocation of the costs was reasonable and was well within the ambit of his powers." Id. at 191. We reasoned that the controlling statutory provision, N.J.S.A. 18A:13-34 (which calls for a special election on the apportionment of costs for a regional district), was not applicable in the context of a compulsory merger ordered by the Commissioner, and that requiring voter approval would "disable effective action toward fulfillment of the State's educational and desegregation policies . . . nullify[ing] the very holding in Jenkins." Ibid.; cf. N.J.S.A. 18A:7F-6 (authorizing Commissioner to compel school districts to make additional expenditures even after school budgets have been approved by voters when "necessary to ensure implementation of [thorough and efficient] standards"). In this case also, the constitutional imperative to address racial segregation requires the Board to compel North Haledon to remain in the Regional District despite the tax burden on its citizens. As in Jenkins, when a constituent municipality is compelled to participate in a Regional District, N.J.S.A. 18A:13-23 is not applicable and the Commissioner may determine cost allocations among and between Haledon, Prospect Park, and North Haledon.

[N. Haledon, supra, 181 N.J. at 184-86 (emphasis added).]

Here, however, neither the Commissioner nor the court has mandated that Seaside Park remain a member of Central Regional in contravention of the desire of the voters in the District

A-0743-10T4

pursuant to the statutory scheme. Rather, the voters rejected the referendum on dissolution, see N.J.S.A. 18A:13-59, never voted on the issue of Seaside Park's withdrawal, see ibid., and rejected a modification of the funding formula after the court's February 2008 decision, see N.J.S.A. 18A:13-23.3. Seaside Park may pursue a referendum on withdrawal or other appropriate administrative action to obtain relief. However, because this case does not implicate the impact of withdrawal or dissolution on racial diversity or issues of other constitutional dimension after a successful referendum, we discern no basis to invoke the extraordinary remedy of judicial intervention and mandate that the Commissioner implement an equitable cost allocation.

Plaintiffs' recourse is to lobby the Legislature to change the statutory mechanisms for dissolving or withdrawing from a regional school district, or for revising its funding formula. As is evident from the extensive legislative history set forth in this opinion, it is clear the Legislature has considered this issue at length over the years and has chosen not to embrace plaintiffs' position. We discern no basis here to second-guess that policy choice, and thus affirm summary judgment dismissal of plaintiffs' first count.

A-0743-10T4

## C.  Count Four - Court's Equitable Powers

Count four alleged that the statutory remedies available for plaintiffs to dissolve, withdraw from, or change the funding formula for Central Regional are illusory because Seaside Park is unable to achieve any of these results.  The court dismissed this count with prejudice as failing to state a claim, reasoning that "[t]he mere fact that any of the [constituent] districts may vote against the change [in the apportionment method] does not as a matter of law make the remedy illusory" and that Lacey Township's successful withdrawal from the District in 1977 contradicted plaintiffs' argument as to impossibility.

Judge Buczynski astutely elaborated on this point in his ruling on plaintiffs' motion for reconsideration, emphasizing the Legislature's prerogative in enacting this comprehensive statutory scheme:

> This court understands the difficulty that Plaintiffs face in withdrawing from the district or in changing the apportionment method.  The Legislature passed these statutes as part of their legislative responsibilities as a separate and distinct branch of government as empowered by the Constitution of this state.
>
> But the mere fact that one district enjoys a majority of registered voters does not, as a matter of law, render this statutory scheme as illusory.  Difficult to navigate, yes, but an illusion, no.  This is not a cognizable Cause of Action in this

state. Voter distribution will vary and will always vary from district to district.

The circumstances, as argued by the Plaintiffs, miss the point. Voter incentives will vary. And I understand that will change from election to election. But the argument that one member of the district enjoys the overwhelming number of registered voters capable of defeating the referendum, thereby making the statutory scheme illusory, is soundly rejected by this Court.

The trial court's ruling on this issue is unassailable. The Legislature has created a high bar for achieving alteration of a regional district's cost allocation formula, N.J.S.A. 18A:13-23 and 18A:13-23.3, or withdrawal from or dissolution of a regional school district, N.J.S.A. 18A:13-59. However, the statutory procedures are not illusory, as evidenced by Lacey Township's withdrawal from Central Regional and other instances in which regional school districts have been dissolved, or municipalities have obtained voter approval to withdraw. See, e.g., N. Haledon, supra, 181 N.J. at 172; In re Div. of Assets & Liabs. Among Constituent Dists. of Lower Camden Cnty. Reg'l High Sch. Dist. No. 1, 381 N.J. Super. 91 (App. Div. 2005), certif. denied, 186 N.J. 605 (2006); In re Petition for Authorization to Conduct a Referendum on the Dissolution of Union Cnty. Reg'l High Sch. Dist. No. 1, 298 N.J. Super. 1 (App. Div.), certif. denied, 149 N.J. 37 (1997); Bd. of Educ. of Twp. of Egg Harbor v. Bd. of Educ. of Greater Egg Harbor Reg'l High Sch. Dist., 188

N.J. Super. 92 (App. Div.), certif. denied, 93 N.J. 245 (1982). The Legislature merely designed the remedy to be difficult to achieve, and that is a policy decision for the Legislature, not to be second-guessed by the Judiciary. See, e.g., Aronberg v. Tolbert, 207 N.J. 587, 602 (2011) ("It is not within our province to second guess the policymaking decisions of the Legislature when no constitutional principle is at issue."); Wildwood Storage Ctr., Inc. v. Mayor & Council of City of Wildwood, 260 N.J. Super. 464, 474 (App. Div. 1992) (holding that public policy decisions are not for the judiciary).

D.  Count Eight -  Efficient System of Education

In count seven, plaintiffs sought relief on the ground that Central Regional's current system of cost apportionment does not provide an efficient system of education for the students in Seaside Park because its taxpayers are paying above the average State cost of education per pupil, in violation of N.J. Const. art. VIII, § 4, ¶ 1.  They concede that their claim is a novel attempt to challenge an allegedly "inefficient system of funding education."

As previously noted, the municipalities and their boards of education generally lack standing to assert the rights of third-party taxpayers. See, e.g., Stubaus v. Whitman, 339 N.J. Super. 38, 47-48, 51 (App. Div. 2001), certif. denied, 171 N.J. 442

(2002); <u>State of N.J., Dep't of Envtl. Prot. & Energy v. Dopp</u>, 268 <u>N.J. Super.</u> 165, 173-74 (App. Div. 1993) (ordinarily, litigants may not claim standing to assert rights of third parties, particularly constitutional rights). In particular, they have no standing to assert a thorough and efficient claim to the extent it is based upon allegedly disparate and burdensome tax rates. <u>Stubaus</u>, <u>supra</u>, 339 <u>N.J. Super.</u> at 49-51. With respect to the thorough and efficient claim, "[t]he real party in interest is the taxpayers." <u>Id.</u> at 50.

In dismissing this count for failure to state a claim, the court enumerated the ten elements of a thorough and efficient education outlined in <u>Abbott II</u>, <u>supra</u>, 119 <u>N.J.</u> at 350 n.23, which are not encompassed in Seaside Park's sole allegation "that the cost results in something other than an 'efficient education.'" As Judge Buczynski elaborated on reconsideration, "[e]fficiency in taxation is not what is constitutionally protected" by the thorough and efficient clause; rather, what is mandated is operational efficiency within school districts.

Nor does Seaside Height's BOE's bald allegation that it could provide a more thorough and efficient education to its students if Central Regional were dissolved or if Seaside Heights were permitted to withdraw from the District, provide a basis to conclude that the District was unable to serve the

needs of its students. In order to justify the "radical" solution of encroaching upon an area constitutionally reserved to the Legislature, a finding of constitutional deficiency "must rest on granite" and not, as here, "hang by a thread." Abbott II, supra, 119 N.J. at 320-21.

Plaintiffs' arguments on this issue misinterpret the constitution and relevant case law. The state constitution provides that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1. In interpreting the "thorough and efficient" clause, our courts have focused primarily on the education of students, not with equality among taxpayers. See, e.g., Abbott II, supra, 119 N.J. at 303-22, 348-50, 357-68 (1990); Robbiani v. Burke, 77 N.J. 383, 393-95 (1978); Robinson, supra, 62 N.J. at 513, 515; Stubaus, supra, 339 N.J. Super. at 52-56.

Similarly, in establishing the Department of Education to supervise and control public education, see N.J.S.A. 18A:4-1 to 18A:7G-48, in defining and designing a thorough and efficient system of education, and in implementing state monitoring to determine whether a thorough and efficient system of education

A-0743-10T4

is being provided, the Legislature has focused on the quality of children's education and the operational efficiency of school districts.    See, e.g., N.J.S.A. 18A:4-24; N.J.S.A. 18A:7-8; N.J.S.A. 18A:7A-10; N.J.S.A. 18A:7A-14a; N.J.S.A. 18A:7C-1; N.J.S.A. 18A:7F-46; Abbott II, supra, 119 N.J. at 348-52; In re Trenton Bd. of Educ., 86 N.J. 327, 329-30 (1981); In re Application of Bd. of Educ. of Upper Freehold Reg'l Sch. Dist., 86 N.J. 265, 272-78 (1981); Robinson, supra, 69 N.J. at 456-63.

Here, there is no allegation that the students of Central Regional are not receiving a thorough and efficient education, i.e., that there are insufficient financial resources in the District to provide a thorough education, or that financial resources are being squandered at the expense of the children's education.    Rather, plaintiffs attack the constitutionality of the equalized valuation method for funding regional school districts because it imposes a greater financial burden on municipalities such as Seaside Park, which have high property values and few students attending the school system.    The distribution of education costs among taxpayers is a policy decision to be made by the Legislature, which determined that a wealth-based formula for funding regional districts was an appropriate option, and plaintiffs' arguments should be directed to that body.    Stubaus, supra, 339 N.J. Super. at 56, 60-61;

A-0743-10T4

<u>Twp. of Princeton v. N.J. Dep't of Educ.</u>, 163 <u>N.J. Super.</u> 389, 396 (App. Div. 1978).  <u>See also</u> <u>Abbott II</u>, <u>supra</u>, 119 <u>N.J.</u> at 304 (court's function limited to constitutional review).

This result is consistent with relevant precedent. Specifically, in <u>Township of Princeton</u>, <u>supra</u>, we rejected a constitutional thorough-and-efficient challenge to the phase-in of the 1975 amendment to the method of allocating costs of regional school districts, from per pupil to equalized valuation, stating:

> Since the total amount expended for education in the district is determined by the regional school district board before the apportionment among the municipalities, the mere method of apportionment of the costs, whether on a per pupil or ratables basis, has no effect whatever on the quality or opportunity of education of the children within that district.  It is for that reason that the <u>Robinson</u> precepts do not come into play.  Although the choice of method of apportionment may create an unequal tax burden among the municipalities of the district, as the record reflects, it does not influence the level of expenditures made by the district for educational purposes.
>
> <u>[T]he method of allocation, whether it be on the basis of ratables (N.J.S.A. 18A:13-23), or the number of pupils enrolled, or on a combination of both (N.J.S.A. 18A:13-23.1), is a matter preeminently within the power of the Legislature and has no bearing upon the issue of constitutionality as delineated in the *Robinson* cases.</u>
>
> [163 <u>N.J. Super.</u> at 396 (emphasis added) (internal citations omitted).]

63

Moreover, both the Supreme Court and our court have rejected other constitutional challenges to equalized valuation funding. For example, considering a challenge to the 1956 amendments, wherein the Legislature moved from "ratables" to "apportionment valuations" for purposes of funding certain regional school districts, the Supreme Court spoke in language that is equally applicable to plaintiffs' claims here:

> In essence, we are presented with a situation where Berkeley Heights claims a vested right in unequal distribution of the burden [of funding a regional school district], seeking a continuation of the prior practice. It complains that upon a per capita student basis the property owners of that township are paying a disproportionate share of the regional burden, thereby subsidizing the education of students from other municipalities comprising the regional school district. The factor has no constitutional implications. Education is a matter of public concern; the expenditures necessary to fulfill the responsibility need not be met on a basis of direct benefit to the property charged.

> [Berkeley Heights, supra, 23 N.J. at 282.]

The Court went on to state that, if Berkeley Heights wished to move to apportionment of costs on a per pupil basis, it had to follow the statutory procedures. Id. at 283-84.

In Borough of Sea Bright v. State, Department of Education, 242 N.J. Super. 225 (App. Div.), certif. denied, 127 N.J. 320

(1990), we also rejected an equal protection challenge to the

1975 statutory amendments at issue in the present case, stating:

> We have no doubt that New Jersey's method of financing regional school districts is compatible with the equal protection clauses of the federal and state constitutions . . . . Plaintiffs do not contend that there is any inequality in the school tax burden of residents of Sea Bright compared with residents of the other constituent municipalities in the district. To the contrary, the objective of apportioning the costs of a regional school district among the constituent municipalities according to their property values is to impose substantially equivalent tax burdens for education upon all taxpayers of the district regardless of the municipalities in which they reside. <u>Thus, the method of financing education in a regional school district is substantially the same as in a single municipality school district in that school tax obligations depend upon the value of each taxpayer's real property</u>. Consequently, we have no hesitancy in rejecting plaintiffs' thesis that residents of a municipality such as Sea Bright, which has higher property values and/or fewer children attending public school than other municipalities in the regional school district of which it is a part, have a constitutional right to pay only the actual costs of educating their resident children who attend public school. <u>See</u> <u>Berkeley Tp. Bd. of Ed. v. Bd. of Ed. of Union Co.</u>, 40 <u>N.J. Super.</u> 549, 556 (Law Div. 1956), <u>aff'd</u>, 23 <u>N.J.</u> 276 (1957) (observing that education is a public obligation, and that to hold that the Legislature could not apportion regional district costs among constituent municipalities on the basis of ratables rather than the number of children sent "would erase a concept of the distribution of public tax obligation quite essential to

65

the wellbeing of the public school system and of the body politic.").

[_Id._ at 231-33 (emphasis added).]

See also Stubaus, supra, 339 N.J. Super. at 61 (rejecting equal protection claim stating, "[w]e see nothing unconstitutional about requiring greater local support for the educational program from districts that appear able to pay more based upon the district's property values and average income").

V.

A.    Count Two — Contracts Clause

In Point III, plaintiffs challenge summary judgment dismissal of count two of the complaint. That count alleged the 1975 legislation, mandating that regional school districts be funded through equalized valuation, violated the contracts clauses of the federal and state constitutions by substantially impairing the contract to form Central Regional under which funding was on a per pupil basis, and that by perpetuating the 1975 violation, the 1993 legislation independently violated the federal and state constitutions.

Plaintiffs claim the court erred by finding there was no contract to establish Central Regional, determining the taxpayer plaintiffs of Seaside Park were not third-party beneficiaries of the alleged contract, not addressing the "substantial

impairment" prong of the legal analysis, and concluding the 1975 legislation furthered a legitimate public purpose.

As previously discussed, Judge Buczynski held that governmental entity parties lack standing to pursue this constitutional claim. The judge found the taxpayer plaintiffs failed to provide a written agreement or evidence of the requisite elements for a contract and, even if they could demonstrate the existence of a valid contract, failed to prove they were intended third-party beneficiaries. The judge further found the 1975 and 1993 legislation promoted the "public welfare and education of the students residing in regional school districts" and thus was not an unconstitutional impairment of the alleged contract.

We are convinced Judge Buczynski was correct on all points. However, to resolve this appeal, we need only address the contract issue and not the third-party beneficiary issue.

Both the federal and state constitutions protect against government impairment of contractual obligations. U.S. Const., art. I, § 10, cl. 1; U.S. Const. amend XIV; N.J. Const., art. IV, § 7, ¶ 3.

> The clauses protect against a change in the State's obligations that "operates[s] as a substantial impairment of a contractual relationship." Allied Structural Steel v. Spannaus, 438 U.S. 234, 244, 98 S. Ct. 2716, 2722, 57 L. Ed. 2d 727, 736 (1978). "This

> inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." <u>Gen. Motors Corp. v. Romein</u>, 503 <u>U.S.</u> 181, 186, 112 <u>S. Ct.</u> 1105, 1109, 117 <u>L. Ed.</u> 2d 328, 337 (1992).
>
> [<u>N.J. Educ. Ass'n v. State</u>, 412 <u>N.J. Super.</u> 192, 205 (App. Div.), <u>certif. denied</u>, 202 <u>N.J.</u> 347 (2010).]

"[T]he legal standards for a violation of the contract clause are strict." <u>State Farm Mut. Auto Ins. Co. v. State</u>, 124 <u>N.J.</u> 32, 64 (1991). <u>Accord</u> <u>Nobrega v. Edison Glen Assocs.</u>, 167 <u>N.J.</u> 520, 538-39 (2001) (contract clause construed narrowly in modern cases). Not even a substantial impairment of contract violates the constitution if the governmental action has a "significant and legitimate public purpose," is based upon reasonable conditions, and is related to "appropriate governmental objectives." <u>State Farm</u>, <u>supra</u>, 124 <u>N.J.</u> at 64 (citing <u>Energy Reserves Group, Inc. v. Kansas Power & Light Co.</u>, 459 <u>U.S.</u> 400, 411-12, 103 <u>S. Ct.</u> 697, 704-05, 74 <u>L. Ed.</u> 2d 569, 580-81 (1983)). <u>Accord</u> <u>Windman v. City of Englewood</u>, 200 <u>N.J. Super.</u> 218, 225-26 (App. Div. 1985).

The taxpayer plaintiffs never produced a written contract between any of the parties or any other evidence that the constituent municipalities entered into a contractual agreement. Thus they failed to establish that an express contract existed

68

between themselves and the remaining constituents of Central Regional. The taxpayer plaintiffs similarly failed to establish a contract "implied-in-fact," which they essentially argue exists by virtue of the resolutions passed by the governing bodies of the constituent municipalities acknowledging their agreement to create Central Regional and apportion the tax levy based on pupil enrollment. They further argue that in 1954, when the voters approved the formation of Central Regional and its tax allocation method, they ratified the contractual agreement of the constituent municipalities. Judge Buczynski properly rejected these arguments.

Regional school districts are created solely through the procedures established by the Legislature, and not through any contractual agreement between municipalities. N.J.S.A. 18A:13-34. See also N.J. Educ. Ass'n, supra, 412 N.J. Super. at 206-07 (statute not presumed to create contractual rights unless intent to do so is clearly stated) (citing Nat'l R.R. Passenger Corp. v. Atchinson Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S. Ct. 1441, 1451, 84 L. Ed. 2d 432, 446 (1985) and Dodge v. Bd. of Educ., 302 U.S. 74, 78-79, 58 S. Ct. 98, 100, 82 L. Ed. 57, 61-62 (1937)).

The procedure established by the Legislature for the formation of a regional school district is a referendum.

N.J.S.A. 18A:13-34. A referendum is not a contract; it is legislation enacted directly by voters. See City of Eastlake v. Forest City Enter., Inc., 426 U.S. 668, 678, 96 S. Ct. 2358, 2364, 49 L. Ed. 2d 132, 140 (1976); Great Atl. & Pac. Tea Co. v. Borough of Pt. Pleasant, 137 N.J. 136, 144 (1994); 42 Am. Jur. 2d Initiative and Referendum § 1 (2010); 35 N.J. Practice, Local Government Law §§ 20.1 and 20.3 (Michael A. Pane, Jr.) (4th ed. 2007); Black's Law Dictionary 1285 (7th ed. 1999).

Thus, the resolutions were passed by each municipality, independently, to start the statutory regionalization process and Central Regional then was formed through referendum, a legislative act by voters from the constituent municipalities. The statutory choices at the time for funding the regional school district were average daily attendance or ratables. The voters chose average daily attendance. However, that was subject to change, as there are no vested rights in a statute's continued existence. Phillips v. Curiale, 128 N.J. 608, 620 (1992). Indeed, as noted in this opinion, the system for funding regional school districts has been changed many times over the years; plaintiffs complain about only two of the changes.

Even if there were a contract to form Central Regional, however, neither the 1975 nor the 1993 legislation violated the

contracts clauses of the federal and state constitutions. Statutes are presumed constitutional, and plaintiffs bear a heavy burden in attempting to rebut that presumption. In re C.V.S. Pharmacy Wayne, 116 N.J. 490, 497 (1989), cert. denied sub nom. Consumer Value Stores v. Bd. of Pharmacy, 493 U.S. 1045, 110 S. Ct. 841, 107 L. Ed. 2d 836 (1990). This is particularly so for economic legislation, which does not warrant or permit close scrutiny. N.J. Ass'n of Health Plans v. Farmer, 342 N.J. Super. 536, 552 (App. Div. 2001).

The challenged legislation served a significant and legitimate public purpose of addressing the methods for funding regional school districts, the legislation was based upon reasonable conditions, and the legislation was related to appropriate governmental objectives in response to an ongoing legislative debate as to the appropriate method for funding public education. We may not second-guess the Legislature's wisdom in allocating tax burdens. Simon v. Cronecker, 189 N.J. 304, 337 (2007); N.J. Ass'n of Health Plans, supra, 342 N.J. Super. at 552.

## B. Count III — Property Clause

In Point IV, plaintiffs challenge summary judgment dismissal of count three of the complaint, in which they alleged that the 1975 and 1993 laws are unconstitutional as applied,

constituting a taking of their contractual right to per-pupil funding, and consequently a taking of significantly more of their tax monies, without just compensation. Judge Buczynski correctly found the taxpayer plaintiffs had no property interest in inter-governmental legislation by referendum, and the method of taxation for funding Central Regional was a valid exercise of legislative power and did not constitute a taking.

Both the federal and state constitutions bar the taking of private property for public use without just compensation. U.S. Const. amend. V and XIV; N.J. Const. art. I, ¶ 20. Such a taking may be accomplished in one of two ways:

> 1) via physical taking, in which the government takes title to private property or "authorizes a physical occupation [or appropriation] of property"; or 2) via regulatory taking, through which a government regulation deprives the property owner of all economically viable use of their land.
>
> [Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010) (alteration in original)(citation omitted).]

As previously discussed, plaintiffs had no contractual right to per pupil funding. Therefore, there was no taking of any such contractual right. Nor have plaintiffs established a property interest that has been excessively interfered with as a result of this regulatory scheme. See Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 205 (1991) (holding that an

unconstitutional taking of private property for public use occurs when a statutory scheme does not substantially advance a legitimate public interest and excessively interferes with property rights and interests).

This is not a takings issue; it is a taxation issue. All the 1975 and 1993 legislation did was alter the allocation of tax burdens for property owners located in regional school districts. Following the 1975 legislation, regional school districts were funded the same as every K-12 public school district statewide, i.e., based on property taxes rather than a per pupil cost. The taxes for Central Regional were allocated as if the District were one community, with a uniform rate of school taxes charged to the property owners in the constituent municipalities based on the equalized value of their respective property. Under this allocation method, Seaside Park taxpayers pay regional school taxes at exactly the same rate as property owners in the other four constituent municipalities forming Central Regional. The 1993 law provided circumstances by which a district could modify the apportionment method and left the decision of whether to modify to the voters of the constituent municipalities. The fact that equalized valuation is disproportionate does not render the tax unconstitutional.

A-0743-10T4

"[T]he power of taxation should not be confused with the power of eminent domain." Houck v. Little River Drainage Dist., 239 U.S. 254, 264, 36 S. Ct. 58, 61, 60 L. Ed. 266, 274 (1915). See also Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 223, 106 S. Ct. 1018, 1025, 89 L. Ed. 2d 166, 177 (1986) ("Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another."); Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124, 98 S. Ct. 2646, 2659, 57 L. Ed. 2d 631, 648 (1978) ("[G]overnment may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example."); City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 94 S. Ct. 2291, 41 L. Ed. 2d 132 (1974) (rejecting Fifth Amendment challenge to local tax). "Any tax is a 'taking' in a literal sense, but a bona fide revenue-raising measure is not a 'taking' in a constitutional sense." N.J. Ass'n of Health Plans, supra, 342 N.J. Super. at 553. As previously discussed, we have also rejected tax clause challenges to the 1975 legislation in Sea Bright, supra, 242 N.J. Super. at 229-30, and Township of Princeton, supra, 163 N.J. Super. at 397.

Plaintiffs contend the 1975 and 1993 legislation were not bona fide revenue-raising measures because they did not generate additional tax revenue; all they did was reallocate tax burdens. However, that is a distinction without a difference. The Legislature exercised its authority to apportion the costs of a regional school system in connection with a comprehensive scheme for creating and funding a thorough and efficient system of education. The legislation involved taxation and revenue-raising measures, while advancing a significant public interest.

### C. Count Six — Substantive Due Process

In Point V, plaintiffs challenge summary judgment dismissal of count six of the complaint, in which they alleged that the 1975 and 1993 legislation, as applied, violated their substantive due process rights by depriving them of their property.

Judge Buczynski rejected this argument, concluding the taxpayer plaintiffs failed to present either factual or legal support for his claims of a protected property interest in the form of contractual rights to per pupil funding or to their tax dollars; moreover, the challenged laws furthered a legitimate public purpose. See Gikas v. Washington Sch. Dist., 328 F.3d 731, 735 (3d Cir. 2003) (holding that "a plaintiff must establish as a threshold matter that he has a protected property

interest to which the Fourteenth Amendment's due process protection applies") (citation omitted); <u>Greenberg v. Kimmelman</u>, 99 <u>N.J.</u> 552, 563 (1985) (holding that generally "a state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory"). Plaintiffs' argument on this issue is without merit to warrant further discussion as we are satisfied Judge Buczynski amply addressed and rejected this issue with appropriate legal citations. <u>R.</u> 2:11-3(e)(1)(E).

### D. <u>Counts Six and Seven - Equities</u>

In Point VI, plaintiffs claim the court erred by failing to address (1) their equitable claim that the 1975 legislation frustrated the purpose of their agreement to form Central Regional and (2) their constitutional claim that the 1975 legislation deprived Seaside Park's parents of their substantive due process right to direct the upbringing and education of their children. In Point VII, plaintiffs claim they demonstrated good and just cause for the court to exercise its inherent equitable powers to address the inequities of the current situation.

Judge Buczynski rejected taxpayer plaintiffs' frustration of purpose argument and their alternate theory of a substantive due process violation because these claims were not pled by

A-0743-10T4

plaintiffs and were not supported by the record. The judge rejected plaintiffs' general request for equitable relief on the ground that he had no authority to grant it - the Legislature had provided statutory means for plaintiffs to pursue the relief they sought and judicial override of those procedures would violate the principle of separation of powers. Moreover, notwithstanding the cost borne by Seaside Park's property owners, funding of regional school districts on the basis of equalized valuation was fundamentally fair.

We discern no error in the conclusions reached by Judge Buczynski. Under Rule 4:5-2, litigants are required to include in their pleadings "a statement of the facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which the pleader claims entitlement." Even read indulgently, see Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J. Super. 452, 455 (App. Div. 1985), the second amended complaint is devoid of any claim of frustration of purpose, or that the taxpayer plaintiffs have been deprived of the right to control their children's education. Therefore, the judge correctly declined to address these arguments on summary judgment. See Jersey City v. Haque, 18 N.J. 584, 602 (1955) (stating that "however liberal pleadings may be, the requirement still remains that at least the gist of

a substantive ground of relief must be set forth"). Nevertheless, even if addressed, these claims would fail on their merits for the reasons discussed in earlier issues.

Taxpayer plaintiffs' alternative substantive due process theory fails because the 1975 legislation does not prevent parents from directing the upbringing of their children. See Troxel v. Granville, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 2059-60, 147 L. Ed. 2d 49, 56-57 (2000) (discussing the liberty interest of parents "in the care, custody, and control of their children"). Under the 1975 legislation, the funding mechanism for Central Regional was changed to equalized valuation - a funding mechanism plaintiffs do not like because it costs them more than per pupil funding. The 1975 legislation does not affect their ability to raise their children as they see fit. They are not required to send their children to Central Regional. They can send their children to other schools at their own expense, relocate to another school district, or even home-school their children. Additionally, taxpayer plaintiffs can lobby other voters in the constituent municipalities to pass referenda.

As to taxpayer plaintiffs' request for equitable relief:

> [E]quity will generally conform to established rules and precedents, and will not change or unsettle rights that are created and defined by existing legal

principles. This is the basis for the equitable maxim "equity follows the law," which instructs that as a rule a court of equity will follow the legislative and common-law regulations of rights, and also obligations of contract.

[Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 183 (1985) (internal citations omitted).]

Here, there is no "wrong" to remedy through law or equity. The Legislature has declared the rights and responsibilities of the constituent members of regional school districts. Under the circumstances of this case, the court has no power to override the Legislature's scheme for funding regional school districts, or to provide plaintiffs with an alternative to the legislatively created means for withdrawing from or dissolving Central Regional, or altering the funding mechanism of Central Regional.

This lawsuit is an attempt to achieve through the courts a result that plaintiffs could not achieve pursuant to relevant legislation or through the Department of Education. We discern no basis, equitable or constitutional, to invalidate the challenged statutes, reverse the decisions of either the Commissioner or the Board, or otherwise interfere with the legislative and regulatory schemes.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0743-10T4